## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Kayla Smith** : | |
| 1250 Connecticut Ave., Suite 700 : | |
| Washington DC 20036 : | |
| : | |
| Plaintiff, : | |
| : | |
| : | |
| v. : | |
| : | |
| : | Case No.: 1:24-cv-00428 |
| CAMDEN DEVELOPMENT INC. : | |
| 11 Greenway Plaza, Suite 2400 : | |
| Houston, TX 77046 : | |
| and : | |
| Jose Mancilla : | |
| 637 Maury Ave, : | |
| Oxon Hill, MD 20745 : | |
| Defendants. : | |
| : | |
| : | |

## COMPLAINT FOR DAMAGES

Ms. Kayla Smith, Plaintiff, by and through his counsel, brings this action against Defendants,

Camden Development Inc. (hereinafter, "Employer" or "Camden") and Jose Mancilla, in his

individual capacity, for both District of Columbia and Federal claims of sexual harassment;

sexual assault; hostile work environment; negligence; battery; negligent infliction of emotional

distress; and constructive discharge (the "Claims"). In support of the Complaint, Ms. Smith

alleges the following:

## NATURE OF THE ACTION

Camden Development Inc. is a corporation headquartered in Houston, Texas, organized and existing under the laws of Delaware. Camden is a residential apartments manager and owner property ownership, maintenance, and management, whose workforce totals an approximate 1,600 employees, according to its website. Camden manages at least four properties in the District of Columbia.

Ms. Smith is a 24-year-old Black woman who was hired by Camden during her final semester at Townson University as her first full-time job. Ms. Smith worked as a leasing consultant at two different Camden properties in Washington DC at the time in question.

Ms. Smith received several accolades for exceptional performance, including a call from her regional manager, Richard Key, to congratulate her on earning the highest commission check that had been awarded in the region in nineteen years. Ms. Smith also received a performance bonus for her sales during her short time with Camden. Ms. Smith was regularly in the top five (5) on the sales leaderboard in the DC, Maryland, Virginia region every quarter.

As part of her new-hire orientation, Employer assigned Ms. Smith to watch videos that promoted hugging as the Employer's workplace culture. The videos made no reference to consent, reading body language, or asking as a prerequisite to hugging. Moreover, the videos do not inform the viewer that she has the agency or authority to refuse any form of touching, including hugging.

Because of this assigned video promoting workplace touching without consent, Ms. Smith felt compelled to hug staff at work, including managers, often when she did not wish to be touched. To be seen as a team player and to grow professionally, Ms. Smith submitted to this workplace culture.

Smith v. Camden, et al.              1:24-cv-00428
Complaint for Damages

On March 10, 2023, a non-direct manager locked himself in a room alone with Ms. Smith and asked for a hug. Feeling compelled by the hugging policy and workplace culture, Ms. Smith complied. The manager thereafter sexually assaulted Ms. Smith for over 20 minutes.

Ms. Smith has suffered severe emotional damages because of this sexual assault. Consequently, Ms. Smith took immediate medical leave to recover, and thereafter terminated her employment with Employer.

Ms. Smith now asks this Court to enter a judgment confirming that the Defendant will be held accountable for its abusive policy which led to its agent sexually assaulting Ms. Smith on the job.

## **PARTIES**

1.      Ms. Smith is a resident of Upper Marlboro, Maryland.

2.      Employer, Camden Development Inc. is a real estate management, ownership, and services company, headquarted in Texas, but organized and existing under the laws of Delaware.

3.      Though Employer's Principal Place of Business is in Texas, it operates in multiple jurisdictions, including the District of Columbia, where the events giving rise to this action occurred. On information and belief, at all relevant times, Employer contracted and conducted business within the jurisdiction of the District of Columbia.

## **JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action presents federal questions.

5.      Plaintiff's claims under the law of the District of Columbia arise from the same events as the constitutional claims and are therefore within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

Smith v. Camden, et al.                    1:24-cv-00428
Complaint for Damages

6.      Venue is proper in this Court because the events that give rise to this action occurred in the District of Columbia.

7.      This Court has personal jurisdiction over the Defendant because it maintained connection with the District of Columbia by contract conduct during all times relevant to this Complaint and was engaged in the relevant conduct in the District of Columbia.

8.      Plaintiff has exhausted administrative remedies by obtaining a Notice of Right to Sue on November 13, 2023 from the Equal Employment Opportunity Commission.

## STATEMENT OF FACTS

9.      Ms. Smith is a 24-year-old Black woman.

10.     Ms. Smith was hired as a leasing consultant on August 30, 2021. During all relevant times of this complaint, Ms. Smith was employed by Defendant, Camden.

11.     Ms. Smith was hired by Employer during her final semester of college as her first full-time job.

12.     Ms. Smith was assigned to work, and did in fact work, at Camden Roosevelt apartments located at 2101 16th Street, NW Washington, DC 20009.

13.     On or around April 2, 2022, Ms. Smith split her work duties between Camden Roosevelt and Camden South Capitol located at 1345 South Capitol Street, SW Washington DC 20003.

14.     As a leasing consultant, Ms. Smith was responsible for managing the leasing process, and meeting retention and occupancy goals, at her assigned apartment complex.

15.     As a leasing consultant, Ms. Smith was expected to show empty apartment rooms to prospective renters. As an inherent condition of her role, Ms. Smith would often be alone with prospective renters during tours of available apartment spaces.

Smith v. Camden, et al.        1:24-cv-00428
Complaint for Damages

16.     Ms. Smith would provide about three to six tours in a given day, depending on season.

17.     Camden provided training on what to do with an active shooter while showing an empty apartment room. Camden did not provide any training on how an employee should respond if sexually harassed or sexually assaulted in a room with a prospective renter or coworker.

18.     Camden did not provide information on any escape route when an employee is sexually harassed or assaulted in an empty room with a coworker. There were no company protocols for being alone in an apartment with a prospective renter or coworker, such as leaving the door open or letting another employee know of whereabouts and with whom.

19.     Camden did not inform or provide Ms. Smith of any emergency signal or device that can be triggered in the event of a sexual harassment or sexual assault while alone in an empty apartment room with an assailant, whether prospective renter or coworker.

20.     The only caution provided to Ms. Smith was by Assistant manager, Maria Archeild, who informally advised Ms. Smith to carry protection with her, such as pepper spray or a knife, but to not make it obvious.

21.     As part of her new-hire orientation, Camden assigned Ms. Smith to watch a series of videos regarding company culture and company policy.

22.     One of the orientation videos Employer assigned Ms. Smith to watch was titled "Welcome Home! Camden's New Hire Orientation[.]" The video primarily features women and narrated primarily by women from their perspectives as Camden employees.

23.     In describing the work culture at Camden, a woman in the video claims that "Camden culture is infectious. It truly grabs ahold of you and brings you in." The woman

Smith v. Camden, et al.                    1:24-cv-00428
Complaint for Damages

continues, claiming that "you start living it in your own life. You take so many courses and you go through so many classes and then you're at home and you are hugging people that you normally wouldn't hug because we hug, and we have so much fun."

24.     Each scene depicting a hug featured either women hugging women or women hugging men, with a female narrator gleefully describing Camden's hugging culture. No scene in the video feature men hugging other men.

25.     A second video that Camden required Ms. Smith to watch during her orientation promoted the Employer's hugging policy as its workplace culture. The policy was titled "The Hug Life." The Hug Life video featured a male voice detailing the hugging culture at Camden.

26.     The Hug Life policy video states in full that "you already gotten a taste of Camden's hugging culture in the opening video. But hugging is simply a part of who we are. We genuinely care about the people we work with every day. We treat each other with kindness and respect like good friends, neighbors, and family. And now that you're part of the Camden Family, we look forward to hugging you too."

27.     In promoting hugging as part of workplace culture, the videos made no reference to a) obtaining consent, verbal or otherwise, before touching a worker; or b) limitations – on where to hug workers, how to hug workers, the length of time for appropriate hugs, the circumstances that could make touching workers in this manner inappropriate, harassing conduct, or sexual assault.

28.     Moreover, the videos do not inform the viewer that she has the agency to refuse any form of touching – including hugging – from any Camden employee, manager, or colleague.

29.     The videos do not inform the viewer that she can refuse to be touched without fear of retaliation.

Smith v. Camden, et al.                    1:24-cv-00428
Complaint for Damages

30. The videos do not inform the viewer of the company's sexual harassment policy or her rights to be free from sexual harassment under Title VII of the 1964 Civil Rights Act or the D.C. Human Rights Act.

31. Ms. Smith was not provided workplace sexual harassment training during orientation.

## Ms. Smith's Work at Camden

32. Because of this assigned video promoting workplace touching without consent, Ms. Smith felt compelled to hug staff at work, including managers, often when she did not wish to be touched. To be seen as a team player and to grow professionally, Ms. Smith submitted to Camden's so-called, and self-described, workplace culture.

33. Since being employed with Camden, Ms. Smith has received stellar performance reviews.

34. Ms. Smith had been a top performer with Camden. She has been applauded by her regional manager for earning the highest commission check that had been awarded in the region in nearly two decades. Ms. Smith also received a performance bonus for her sales during her short time with Camden. Ms. Smith was regularly in the top five (5) on the sales leaderboard in the DC, Maryland, Virginia region every quarter.

35. Ms. Smith was a coworker with Jose Mancilla, a non-direct manager for the Employer. Mr. Mancilla was a maintenance manager at the Employer's South Capitol location where Ms. Smith also worked.

36. Ms. Smith and Mr. Mancilla had a professional relationship. Mr. Mancilla once texted Ms. Smith to "check" on Ms. Smith when she was out sick. Excluding this one occurrence, the two never spoke outside of work.

37.     Ms. Smith never flirted with Mr. Mancilla or gave him any indication that she was interested in a sexual relationship.

### Camden's Employee Sexually Assaulted Ms. Smith

38.     On March 10th, Ms. Smith reported to the South Capitol location at or around 9:00 am for her scheduled shift.

39.     Ms. Smith was working in the office alone, as she was the only leasing consultant on site, when Mr. Mancilla entered the office and began working on the computer across from her desk.

40.     Ms. Smith received a text message notifying her that there was a mouse in the guest suite.

41.     Around 9:30 am, Ms. Smith asked Mr. Mancilla if he can remove the mouse when he had a free moment, to which he agreed.

42.     Around 12:15pm Mr. Mancilla came back into the office and informed Ms. Smith that he removed the mouse, but in the course of removal, he locked his phone in the guest suite.

43.     Mr. Mancilla asked Ms. Smith if she had a code to unlock the room. Ms. Smith responded, "there's no code for the guest suite, but I can use the Chirp app to unlock the door for you.[1]" Mr. Mancilla thanked her and the two left the office together to retrieve his phone.

44.     When the two arrived at the guest suite, Ms. Smith unlocked the door with her phone. Both walked inside the guest suite.

45.     Ms. Smith noticed Mr. Mancilla's phone sitting on the kitchen counter. He grabbed the phone and showed her where the mouse was located.

---

[1] Chirp is a mobile device application that enables property management users to access locked apartments without a key.

Smith v. Camden, et al.                    1:24-cv-00428
Complaint for Damages

46.     Ms. Smith then walked to the door to leave, while the two continued small talk conversation about work. Ms. Smith mentioned that she will be "shadowing" workers at a Camden location in Virginia and that she is unsure which new property she will be working at in the future.

47.     Mr. Mancilla replied that he will miss Ms. Smith if she leaves the South Capitol location. She responded with, "we can always talk via Teams and I'm sure I will see you around."

48.     While standing by the door, claiming he would miss Ms. Smith, Mr. Mancilla asked for a hug.

49.     Because of the workplace hugging policy and culture, Ms. Smith is accustomed to hugging coworkers and managers. There was no indication that Mr. Mancilla intended any sexual conduct from the request to hug.

50.     Ms. Smith agreed to hug Mr. Mancilla.

51.     Ms. Smith noticed the hug began to linger, so she told Mr. Mancilla "You don't have to miss me too much. We will stay in touch."

52.     Ms. Smith then told Mr. Mancilla "okay enough hugging," while patting his back to indicate the hug is over.

53.     Mr. Mancilla replied "just one more minute" while refusing to let go of her.

54.     While still hugging Ms. Smith, Mr. Mancilla then kisses her neck.

55.     While still hugging Ms. Smith, Mr. Mancilla reached behind her to lock the door to the guest suite. Ms. Smith was positioned near the front door of the apartment and cornered against the wall, while Mr. Mancilla was standing in front of her.

56.     Ms. Smith rejected Mr. Mancilla by telling him "Do not kiss my neck."

Smith v. Camden, et al.          1:24-cv-00428
Complaint for Damages

57.     Mr. Mancilla then rubbed his hands up and down Ms. Smith's back while she attempted to stop and remove his hands.

58.     Ms. Smith physically froze because she felt extremely uncomfortable and violated by Mr. Mancilla's continued conduct.

59.     Mr. Mancilla then told Ms. Smith that she "feels like Heaven" and that he likes her a lot.

60.     Ms. Smith nervously repeats "Okay that's enough hugging. I have to go back to the office, no one is up there." Mr. Mancilla still refused to stop touching Ms. Smith.

61.     Ms. Smith then tells Mr. Mancilla that "I have a call at 1:00 call" Ms. Smith checked her phone and saw that the time was now around 12:30pm. Mr. Mancilla ignored her statement and continued to grope her.

62.     Ms. Smith attempted to text one of her friends to inform them of this sexual assault, however, Mr. Mancilla continued to force himself on her.

63.     Mr. Mancilla then kisses her neck again as Ms. Smith repeated not to kiss her.

64.     Mr. Mancilla then put his hands in Mr. Smith's pants, grabbing her butt. When Ms. Smith moved his hands, he began touching her breasts before holding her tighter and grinding his body against hers.

65.     At one point, Mr. Mancilla lifted one of Ms. Smith's legs and held her hands over her head while she tried to stop him.

66.     This assault continued until approximately 12:50pm when she repeatedly said to him that she had a call at 1:00pm, and that she has to get back to work.

67.     Mr. Mancilla finally stops and tries to kiss her neck again.

68.     Ms. Smith avoided eye contact with Mr. Mancilla as she instructed him to leave the empty apartment.

69.     Mr. Mancilla left the guest suite with Ms. Smith alone, in the suite in complete shock and disbelief.

70.     Ms. Smith stayed in the guest suite as she attempted to regain composure. Ms. Smith felt anxious and "extremely uncomfortable" and confused about what to do next.

71.     Ms. Smith took her 1:00pm phone call from the guest suite. During the call, Mr. Mancilla texted her that she is needed in the office to issue parking passes for the construction workers. She replied by saying she will be up in 10 minutes.

72.     Ms. Smith describes that while she was still in the guest suite, "I tried to gather myself to go back out there and pretend that nothing ever happened."

73.     When Ms. Smith returned to the office to issue the parking passes, Mr. Mancilla sat across from her at the same desk in which he sat that morning. The concierge was also in the office. Ms. Smith avoided eye contact and interaction with Mr. Mancilla.

74.     After Ms. Smith finished issuing parking passes, she left the office where Mr. Mancilla was still sitting. Ms. Smith returned to the empty guest suite to call a friend and share what happened to her. The friend encouraged her to report the incident to her manager immediately.

75.     Ms. Smith felt nervous and mentally checked out because of the sexual assault. She continued to receive work-related Teams messages from concierge requesting her work.

76.     Because of the sexual assault, Ms. Smith did not have the wherewithal to take her scheduled lunchbreak by 3:00pm. She was unable to focus on work or process the sexual assault itself. Ms. Smith met with a coworker around 4:30pm because she was uncomfortable and

Smith v. Camden, et al.
Complaint for Damages

needed help. The coworker encouraged Ms. Smith to report the incident to her manager. Both the

coworker and Ms. Smith called the manager together to report the sexual assault.

77.     Ms. Smith took immediate medical leave and thereafter terminated her position

with Camden.

78.     Upon reason and belief, Mr. Mancilla worked another day and was terminated the

following week.

<u>**CLAIMS FOR RELIEF**</u>

79.     As to each claim below, Plaintiff realleges and incorporates by reference the

preceding allegations in this Complaint as if fully set forth herein.

**COUNT I SEXUAL HARASSMENT – Title VII of the 1964 Civil Rights Act.**

**(Camden)**

80.     For a prima facie case for sexual harassment, a plaintiff must show that "(1) that

she is a member of a protected class, (2) that she was subject to unwelcome harassment, (3) that

the harassment occurred because of her race or gender, (4) that the harassment affected a term,

condition, or privilege of employment, and (5) that the employer knew or should have known of

the harassment, and failed to act to prevent it." *Tolson v. Springer*, 618 F. Supp. 2d 14, 20

(D.D.C. 2009).

81.     As a Black woman, Ms. Smith's race and gender are protected classes.

82.     Ms. Smith was subjected to unwelcome harassment of a sexual nature by being

subjected to a policy which permits, encourages, and promotes hugging in the workplace,

notwithstanding consent.

83.     The Defendant's requirement to watch an orientation video, in office, that

promotes hugging colleagues and was a necessary term and condition of employment.

84.     The video prominently featured women either hugging each other or hugging men, or women cheerfully describing the hugging culture at Camden.

85.     Because the orientation video features employees exclusively hugging women in the workplace and features no men hugging each other whatsoever, and because the video features women cheerfully describing hugging in the workplace, Employer implicitly demands that women submit to hugs as a term and condition of work.

86.     The conduct specifically targets new employees to indoctrinate them into a workplace that encourages limitless and boundless touching as company culture. The videos fail to cover consent, appropriate ways to hug, appropriate places or environments to hug in, or appropriate lengths of hugging. The videos failed to make any conceivable attempt to protect its workers against unwanted or inappropriate touching in the workplace. This conduct is objectively offensive, intimidating, and hostile toward women, especially new and younger women who are vulnerable to inappropriate company culture.

87.     Defendant knew or should have known of the hostile work environment to which it subjected Plaintiff but failed to take action to stop such unlawful conduct. The Defendant knew about this harassment because it was the harasser.

88.     As a result, Plaintiff has suffered and is suffering considerable injuries, including emotional distress, anxiety, and mental anguish.

**COUNT II SEXUAL HARASSMENT – DC Human Rights Act.**

**(Camden)**

89.     The newly amended D.C. Human Rights Act provides, in relevant part, that:

(A) Harassment" means conduct, whether direct or indirect, verbal or nonverbal, that unreasonably alters an individual's terms, conditions, or privileges of employment or has the purpose or effect of creating an intimidating, hostile, or offensive work environment.
(B) "Sexual harassment" means:

Smith v. Camden, et al.                          1:24-cv-00428
Complaint for Damages

(i) Any conduct of a sexual nature that constitutes harassment as defined in subparagraph (A) of this paragraph; and

(ii) Sexual advances, requests for sexual favors, or other conduct of a sexual nature where submission to the conduct is made either explicitly or implicitly a term or condition of employment or where submission to or rejection of the conduct is used as the basis for an employment decision affecting the individual's employment.

D.C. Code Ann. § 2-1402.11 (West).

90.     The Defendant's orientation video and hugging policy directly altered Ms. Smith's terms of employment by subjecting her to the sexually degrading expectation and workplace hugging her managers and coworkers.

91.     This hugging policy endangered Plaintiff's privilege of working in a safe and comfortable environment.

92.     Enforcement of such a sexually harassing policy has no bearing on the existence of the policy itself. Even if the policy was not enforced and lead to no punishment, it was never communicated to plaintiff that refusal to hug would not affect her job, such as supervisors viewing her as a team player, good to work with, or whether she is adaptable to workplace culture or workplace rules.

93.     As a result, Plaintiff has suffered and is suffering considerable injuries, including emotional distress, anxiety, pain and suffering, and mental anguish.

**COUNT III SEXUAL HARASSMENT – Title VII of the 1964 Civil Rights Act.**

**(Camden)**

94.     Because of Ms. Smith's gender, she endured sexual harassment from a Camden manager.

95.     Defendant knew or should have known of the hostile work environment to which it subjected plaintiff but failed to take action to stop such unlawful conduct. Defendant knew of

Smith v. Camden, et al.
Complaint for Damages

its hugging policy and also knew that by virtue of Ms. Smith's position, she would be alone in empty apartment rooms with perspective renters and/or colleagues.

96.     Defendant failed to educate employees on consent when engaging in hugging or any form of touching. Defendant failed to educate employees on reasonableness of hugging in the workplace.  Defendant failed to educate employees on their agency to refuse a hug in uncomfortable environments. Defendants failed to provide any training on sexual harassment or assault protocols when alone with a prospective renter or colleague in an empty apartment.

97.     Defendant's manager-employee engaged in direct conduct of a sexual nature against Plaintiff's wishes and protest.

98.     Defendant's manager-employee initiated a "hug" pursuant to Defendant's hugging policy and refused to let go against Plaintiff's wishes and protest.

99.     Defendant used the hugging policy as an entry point to sexually assault Plaintiff.

100.    As a result, plaintiff has suffered and is suffering considerable injuries, including emotional distress, anxiety, mental anguish, loss of enjoyment of life, and reputational harm.

### SEXUAL HARASSMENT – DC Human Rights Act.

### (Both Defendants)

101.    Because of Ms. Smith's gender, she endured sexual harassment from a Camden manager.

102.    Defendant knew or should have known of the hostile work environment to which it subjected plaintiff but failed to take action to stop such unlawful conduct. Defendant knew of its hugging policy and also knew that by virtue of Ms. Smith's position, she would be alone in empty apartment rooms with perspective renters and/or colleagues.

Smith v. Camden, et al.
Complaint for Damages

103.    Defendant failed to educate employees on consent when engaging in hugging or any form of touching. Defendant failed to educate employees on reasonableness of hugging in the workplace.  Defendant failed to educate employees on their agency to refuse a hug in uncomfortable environments. Defendants failed to provide any training on sexual harassment or assault protocols when alone with a prospective renter or colleague in an empty apartment.

104.    Defendant's manager-employee engaged in direct conduct of a sexual nature against Plaintiff's wishes and protest.

105.    Defendant's manager-employee initiated a "hug" pursuant to Defendant's hugging policy and refused to let go against Plaintiff's wishes and protest.

106.    Defendant used the hugging policy as an entry point to sexually assault Plaintiff.

107.    As a result, plaintiff has suffered and is suffering considerable injuries, including emotional distress, anxiety, mental anguish, loss of enjoyment of life, and reputational harm.

## COUNT V NEGLIGENCE

### (Camden)

108.    To allege a negligence claim, a plaintiff must allege facts sufficient to show "(1) a duty, owed by the defendant to the plaintiff, to conform to a certain standard of care; (2) a breach of this duty by the defendant; and (3) an injury to the plaintiff proximately caused by the defendant's breach." *District of Columbia v. Fowler*, 497 A.2d 456, 463 n.13 (D.C. 1985).

109.    Camden owed all of its employees – including Ms. Smith – a duty of reasonable care in protecting her from workplace violence. Its "Hug Life" policy endangered young women like Ms. Smith because it subjected them to a culture of coworkers and managers with power over them touching them, notwithstanding consent. Camden employed this hugging policy without taking reasonable steps to ensure the safety of its employees under this policy. Camden

Smith v. Camden, et al.          1:24-cv-00428
Complaint for Damages

failed to educate their workers on consent regarding touching. Camden failed to educate their workers on reading body language when engaging in hugging, or which environments are inappropriate to hug a coworkers, such as being alone in an empty apartment with them. Camden failed to educate employees on their agency to refuse a hug in uncomfortable environments. Camden failed to provide any training on sexual harassment or assault protocols when alone with a prospective renter or colleague in an empty apartment. Camden breached its duty of care when it took no reasonable steps in protecting their workers from its own dangerous policy.

110.    Because of Camden's breach, Ms. Smith was sexually assaulted by her coworker, who initiated the sexual assault by using Camden's hugging policy.

111.    As a result, Plaintiff has suffered and is suffering considerable injuries, including emotional distress, mental anguish, loss of enjoyment of life, and reputational harm.

## COUNT VI - BATTERY

### (Camden)

112.    To establish liability for the tort of battery in the District of Columbia, a plaintiff must plead and establish that the defendant caused "an intentional, unpermitted, harmful or offensive contact with his person or something attached to it." *Marshall v. District of Columbia,* 391 A.2d 1374, 1380 (D.C.1978).

113.    Camden's employee, Mr. Mancilla, was acting within the scope of his employment when he went into the empty apartment with Ms. Smith, and hugged her pursuant to Camden's own "Hug Life" culture policy. This touching became unconsented once Ms. Smith verbally objected, and physically attempted to push Mr. Mancilla away.

114.    Mr. Mancilla continued the unpermitted contact whereby he intended, and in fact, caused harmful and offensive touching.

115.    As a result, Plaintiff has suffered and is suffering considerable injuries, including emotional distress, mental anguish, loss of enjoyment of life, and reputational harm.

## COUNT VII – BATTERY

### (Jose Mancilla)

116.    Mr. Mancilla engaged in harmful and offensive touching when he groped, kissed, licked, grinded his body against, humped on, and otherwise sexually touched Ms. Smith without her consent. On multiple occasions during the interaction, Ms. Smith verbally objected, and physically attempted to push Mr. Mancilla away. Mr. Mancilla continued the unpermitted contact whereby he intended, and in fact, caused harmful and offensive touching.

117.    As a result, plaintiff has suffered and is suffering considerable injuries, including emotional distress, anxiety, mental anguish, loss of enjoyment of life, reputational harm, loss of self-esteem,  loss of income, loss of quality of life, loss of future income, and embarrassment.

## COUNT VIII  – CONSTRUCTIVE DISCHARGE

### (Camden)

118.    To establish constructive discharge, the Plaintiff must demonstrate, beyond the showing of hostile work environment, that the abusive working environment became so intolerable that her resignation qualified as a fitting response.  *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008).

119.    Ms. Smith submitted to the boundless and unrestricted workplace culture of women hugging as a condition and term of her employment at Camden.

120.    Ms. Smith was sexually assault by a Camden manager who used the boundless and unrestricted hugging policy initiate touching while alone in a room with a young, female employee.

Smith v. Camden, et al.                  1:24-cv-00428
Complaint for Damages

121.    Because Ms. Smith was sexually assaulted by way of the hugging policy, and because Ms. Smith would be expected to continue working under the hugging policy that was used to sexually assault her, she could not conceivably continue employment with Camden. Camden's work conditions became so intolerable that Ms. Smith had no choice but to terminate her position.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against the Defendants and prays for the following relief:

A.    Enter a judgment in Ms. Smith's favor against Defendant Camden for harassment, hostile work environment on the basis of sex, negligence, and battery in violation of Title VII of the 1964 Civil Rights act (42 U.S.C.A. §2000e *et seq.*) Human Rights Act (D.C. Code § 2-1401 *et seq.*); and common law;

B.    Permanently enjoin all Defendant Camden, its officials, agents, employees, assigns, and all other persons acting in concert or participating with them from engaging in workplace policies encouraging or soliciting hugging or similar intimate touching of a coworker's or subordinate's person in violation of both Title VII of the 1964 Civil Rights Act and the D.C. Human Rights Act;

C.    Issue a declaratory judgment that both of the Defendants' conduct as complained herein violated Plaintiff's civil rights and rights under Washington DC law;

D.    Award reasonable and appropriate compensatory damages to Plaintiff, in an amount to be ascertained at trial, including but not limited to, emotional distress, embarrassment, anxiety, humiliation, exclusion, inconvenience, loss of enjoyment, loss of earning capacity, and

Smith v. Camden, et al.
Complaint for Damages

Page 19 of 20
1:24-cv-00428

loss of income, from which Ms. Smith continues to suffer by Defendants' unlawful conduct described above;

     E.    Award exemplary and punitive damages to Plaintiff, in an amount to be ascertained at trial, to deter similar unlawful acts in the future;

     F.    Award reasonable attorneys' fees and costs incurred in bringing and maintaining this action, as allowed by law;

     G.    Award past and future economic damages for all claims as allowed by law, in an amount to be determined at trial, including but not limited to, back pay and interest on the same, front pay, and lost benefits;

     H.    Award such other and further relief as this Court deems necessary and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

Robert Baldwin III, Esq.
Bar No. 90002020
Virtue Law
1250 Connecticut Ave, Suite 700
Washington D.C., NW 20036
T: (301) 821-6407
Robert@virtuelawgroup.com
*Counsel for Plaintiff*